[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-13829

_____

D.C. Docket No. 8:15-cv-00076-SCB-TGW

SCOTT AXEL,

Plaintiff-Appellant,

versus

FIELDS MOTORCARS OF FLORIDA, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 6, 2017)

Before ED CARNES, Chief Judge, and WILLIAM PRYOR, Circuit Judge, and
MOORE,[*] District Judge.

_____

[*] Honorable K. Michael Moore, United States District Chief Judge for the Southern District of
Florida, sitting by designation.

MOORE, District Judge:

Scott Axel ("Plaintiff") was learning the business of automobile wholesaling from his father, a wholesaler employed by Fields Motorcars of Florida, Inc. ("Fields Motorcars"). Plaintiff shadowed his father for fifteen months. During this time, Plaintiff also did additional wholesale work, as well as some retail work. This arrangement continued until Fields Motorcars terminated Plaintiff's father in the spring of 2014, at which point Plaintiff stopped coming to work as well. Plaintiff received no compensation during those fifteen months and, following his father's termination, sued Fields Motorcars, alleging violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201–219 ("FLSA"), and the Florida Minimum Wage Act, Fla. Stat. § 448.10, *et seq.* ("FMWA").

On summary judgment, the district court stated that Plaintiff's unorthodox employment did not neatly fit into traditional employment categories and concluded that Plaintiff was not a Fields Motorcars employee. Because it found that Plaintiff was not an employee, the district court granted summary judgment in favor of Fields Motorcars on the FLSA and FMWA claims. Plaintiff now appeals that decision. After careful consideration and with the benefit of oral argument, we conclude that material issues of fact remain which preclude the entry of summary judgment.

2

## I. BACKGROUND

Fields Motorcars is a multi-marque automobile dealer operating nationally. It sells and leases new and used automobiles, and also services international automobile brands. Towards the end of 2012, Plaintiff applied for a sales position at Fields Motorcars but Plaintiff did not receive an offer. In the years preceding his employment application, Plaintiff was arrested for driving while intoxicated, terminated as an Enterprise Rent-A-Car management assistant for failing to show up to work, and sought treatment for drug addiction at a residential drug treatment facility for approximately eight months.

Plaintiff's father, Michael Axel, worked as an automobile wholesaler for Fields Motorcars at its Lakeland BMW and Mercedes stores. Michael spoke with Gary Gordon, the General Manager of the Lakeland BMW and Mercedes stores and Michael's direct supervisor, about finding a job for his son—in sales or in any other open position.[1] Mr. Gordon told him that he was not hiring any new employees at that time. Michael suggested that Fields Motorcars hire Plaintiff as an employee and that Michael would split his own compensation or commissions with Plaintiff. Mr. Gordon rejected this proposal. They discussed an arrangement whereby Michael would hire Plaintiff as his own employee and teach Plaintiff how to become an automobile wholesaler, with the future possibility of assuming

---

[1] The Parties dispute who first suggested that Scott work for Michael. Michael testified that Mr. Gordon first made the suggestion but Mr. Gordon denies this.

3

Michael's role upon his retirement. A few days later, Plaintiff met with Michael and Mr. Gordon to discuss the arrangement. There was no agreement that Fields Motorcars would compensate Plaintiff while he was learning how to be a wholesaler. According to Plaintiff, Mr. Gordon said "[a]s long as you try to learn everything you can that your dad knows, you know, we'll try to ease you in here." Michael did not split his compensation with Plaintiff or pay him directly, but did provide Plaintiff and his children with a place to live and other financial support.

Towards the middle or end of January 2013, Plaintiff began working with his father. On a typical day, Plaintiff and his father arrived at the Lakeland BMW store together at around 8:30 or 9:00 in the morning. Alongside his father, Plaintiff reviewed inventory, attended a daily used-car meeting with Mr. Gordon, and would then go to lunch. In the afternoon, Plaintiff would meet with the used car manager, who would have a list of cars for Plaintiff to post for sale. Plaintiff posted cars on an internal website called TradeRev, an on-line auction for dealers who subscribe to the website. In order to post on TradeRev, Plaintiff used an application on his phone and had to enter a password that was provided to him by Lance Lightsey—the sales manager. Plaintiff spent several hours each day posting vehicles for wholesale on TradeRev. Additionally, Plaintiff also possibly discussed cars that could be listed for retail sale and new inventory, as well as cars that needed to be posted on eBay or Craigslist. Plaintiff researched cars that were for

4

sale at auction. Plaintiff also purchased cars from other Fields Motorcars dealerships, and brought them to the Lakeland BMW and Mercedes stores. Plaintiff estimates that he signed at least sixty or seventy purchase agreements.

Plaintiff learned what the role of an automobile wholesaler entailed from his father. These duties included traveling to different auctions and researching vehicles that were for sale at auction. Plaintiff never attended auctions without his father and rarely came to work at either of the Lakeland Mercedes or Lakeland BMW stores without his father. Unrelated to wholesaling, Plaintiff also did some retailing, including posting cars for sale on eBay and Craigslist. Other minor and infrequent tasks Plaintiff might have done included washing a car, filling a car with fuel, or picking a car up at an auction. Plaintiff estimates that he worked in excess of 60 hours per week. In mid-May of 2014, Plaintiff stopped working at Fields Motorcars.

## II. STANDARD OF REVIEW

The determination of an individual's employment status under the FLSA is a question of law and reviewed de novo. *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1207 (11th Cir. 2015).

Decisions granting summary judgment under Fed. R. Civ. P. 56 are reviewed de novo. *Evans v. Stephens*, 407 F.3d 1272, 1277 (11th Cir. 2005). Summary judgment is appropriate only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the court does not make credibility determinations, but instead believes the evidence of the non-movant and all justifiable inferences are drawn in his favor. *Evans*, 407 F.3d at 1277. And "when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version." *Id*. at 1278.

### III. THE FLSA[2]

In 1938, Congress enacted the FLSA "to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697, 707 n. 18 (1945). However, the FLSA's protections extend only to employees. *Schumann*, 803 F.3d at 1207. The FLSA broadly defines an "employee" as "any individual employed by an employer," and an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §§ 203(d) and (e)(1). To "employ" is "to suffer or permit to work." 29 U.S.C. § 203(g).

These broad definitions are intended to be "comprehensive enough" to include "working relationships, which prior to this Act, were not deemed to fall within an employer-employee category." *Rutherford Food,* 331 U.S. 722, 729

---

[2] The same legal standards that apply to Plaintiff's FLSA claim also apply to the FMWA claim. *See* Article X, Section 24, Fla. Const.

(1947) (quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150 (1947)).

"Without doubt the Act covers trainees, beginners, apprentices, or learners *if* they are employed to work for an employer for compensation." *Portland Terminal*, 330 U.S. at 151 (emphasis added).Thus, not all trainees are covered.

To determine whether an individual is an employee or an exempted trainee, courts look to the totality of the circumstances. *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1181 (11th Cir. 2012). As training programs and internships have evolved over time, so have the relevant tests and considerations.

The seminal case analyzing whether trainees are employees under the FLSA is *Walling v. Portland Terminal Co.* In *Portland Terminal*, individuals participated in a week-long practical training course provided by the defendant railroad. 330 U.S. at 149. During training, an individual would first learn by observation and then, under close supervision, be permitted to do actual work that did not displace any of the regular employees' work. *Id*. The Supreme Court concluded that, because the railroads received no immediate advantage from the trainees' work, the trainees were not employees under the FLSA. *Id.* at 153. The Supreme Court stated that it did not ignore "the argument that such a holding may open up a way for evasion of the law. But there are neither findings nor charges here that these arrangements were either conceived or carried out in such a way as to violate either

the letter or the spirit of the minimum wage law." *Id*. Thus, in *Portland Terminal*, the Supreme Court focused on the immediate advantage to the employer.

More than sixty years later, this Court considered the employment status of students enrolled in a program that required clinical placement as part of a course of study. *Schumann*, 803 F.3d at 1199. In *Schumann,* plaintiffs were twenty-five former student registered nurse anesthetists who attended a master's degree program that required both classroom and clinical training, with the goal of becoming certified registered nurse anesthetists. *Id.* at 1202. As part of the clinical training, the students were required to participate in a minimum of 550 clinical cases in a variety of surgical procedures. *Id.*at 1203. Additionally, the students completed other tasks during the clinical phase of training, such as cleaning equipment, preparing forms, and stocking anesthesia carts. *Id.* at 1204. The students alleged that they were employees entitled to FLSA protection because defendant benefited financially by using their services instead of certified registered nurse anesthetists whom they would have had to pay. *Id*. The district court found that the students were not employees and granted summary judgment in favor of defendant. *Id.* at 1202. On appeal, this Court stated that the best way to discern the primary beneficiary in a relationship where both the intern and the employer may benefit significantly is to "focus on the benefits to the student while still considering whether the manner in which the employer implements the

8

internship program takes unfair advantage of or is otherwise abusive towards the student." *Id.* at 1211.

In *Schumann,* the Court analyzed seven non-exhaustive considerations, borrowed from the Second Circuit, that are helpful in determining the primary beneficiary of modern internships. *Id.* at 1211–1212 (citing *Glatt v. Fox Searchlight Pictures, Inc.*, 791 F.3d 376 (2d Cir. 2015)).[3] These factors are:

1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.
2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.
3. The extent to which the internship is tied to the intern's formal education program integrated coursework or the receipt of academic credit.
4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.
5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.
6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.
7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

*Id.* (quoting *Glatt*, 791 F.3d at 384). The *Schumann* Court, upon finding the *Glatt* analysis inconclusive, was unable to determine the primary beneficiary of that

---

[3] The *Schumann* Court cited to a prior version of the *Glatt* opinion which was subsequently amended and superseded.

particular employment relationship. *Id.* at 1214. The Court vacated the district

court's grant of summary judgment and remanded for further proceedings. *Id.* at

1215.

Thus, in *Schumann*, this Court focused on the primary beneficiary of the

internship relationship. *Schumann* also tells us that an individual's employment

status may be bifurcated depending on either the task or hours worked beyond

what could be fairly expected. *Id.* at 1214. Importantly, the Court noted that

> in applying the factors to ascertain the primary beneficiary of an
> internship relationship, we caution that the proper resolution of a case
> may not necessarily be an all-or-nothing determination. That is, we
> can envision a scenario where a portion of the student's efforts
> constitute a *bona fide* internship that primarily benefits the student,
> but the employer also takes unfair advantage of the student's need to
> complete the internship by making continuation of the internship
> implicitly or explicitly contingent on the student's performance of
> tasks or his working of hours well beyond the bounds of what could
> fairly be expected to be a part of the internship.

*Id.* at 1214–1215.

The factors and inquiries put forth in the *Portland Terminal* "immediate

advantage" test and the *Schumann* primary beneficiary test overlap substantially.

As this Court noted in *Schumann*, "the *Glatt* factors involve consideration of the

same or similar facts to those that the Supreme Court found important in *Portland*

*Terminal* and that the DOL Handbook guidance deemed relevant factors for

consideration." *Schumann*, 803 F.3d at 1212.

## IV. DISCUSSION

During the fifteen months or so that Plaintiff worked at Fields Motorcars, he was learning the business from his father, a wholesaler. Plaintiff was not enrolled in a formal educational program, but he was undoubtedly afforded the opportunity to learn a trade by observation and practical application.

Although the scenarios described in *Portland Terminal* and *Schumann* are not precisely analogous, the *Schumann* approach provides the most applicable guidance for the employment relationship at hand. Specifically, we consider the non-exhaustive *Glatt* factors in assessing the primary beneficiary of the relationship between Plaintiff and Fields Motorcars, and we also bear in mind the import of the analysis set forth in *Portland Terminal*.

The first *Glatt* factor—expectation of compensation—does not support a finding that Plaintiff was an employee. Plaintiff did not receive any compensation for his work at Fields Motorcars—either from Fields Motorcars or his father. Plaintiff understood that his father would earn commissions on the wholesaling work that Plaintiff did. Plaintiff thought it was a good opportunity and hoped that it might lead to a full-time position. Plaintiff did not expect to be compensated for the work he was doing at Fields Motorcars. At best, Plaintiff expected future employment but future employment and an expectation of compensation are not one and the same.

11

The district court correctly noted that *Glatt* factors two through four are inapplicable here as they are tailored to training in the context of a formal academic program and neither party contends that the training at issue was part of such a program.

The fifth *Glatt* factor—duration—does not clearly cut one way or the other. The relevant inquiry is whether the duration of the training was necessary to accomplish the goals of the training. *See Schumann*, 803 F.3d at 1213. However, the record is unclear as to what the goals of the training were, whether those goals were met and, if so, when those goals were met. Despite these outstanding threshold questions, certain facts bear noting.

At fifteen months, the training period seems fairly long and it is not evident from the record that Plaintiff's work was limited to the period in which the training provided beneficial learning. The training period was also presumably indefinite as it was tied to Michael's retirement, which had no date certain.[4] Plaintiff testified that Mr. Gordon told him that "there was a good chance [he] could take [Michael's] position when *and if* [Michael] retired." This fact is inconclusive but suggests that the duration of the training might have been excessive. Consideration of Plaintiff's work schedule is also relevant to this inquiry. *See id.* at 1213–14 ("As

---

[4] We have no reason to know whether the training period would have continued but for Michael's termination. As previously noted, Plaintiff stopped coming to work in May of 2014—which coincided with Michael's termination.

12

part of this consideration, the court should also evaluate the extent to which the nature of the training requires the daily schedule that the intern must endure.") It is possible that Plaintiff's alleged sixty-hour work week was excessive for purposes of meeting the goals of his training.

A review of the sixth *Glatt* factor—displacement of work—suggests that Plaintiff was a trainee at times and an employee at others. The contours of Plaintiff's workday were primarily defined by his father's job. Michael testified that his duties as wholesale manager included: purchasing inventory for the Lakeland Mercedes and Lakeland BMW stores, helping the used car managers certify vehicles, assisting the sales staff, pricing cars, and clearing out inventory after sixty days. Plaintiff spent much of his time shadowing his father—which would support finding him a trainee. Plaintiff also came to work with his father each day and attended meetings and auctions with his father.

Plaintiff also did wholesaling work which his father did not do. This "extra" wholesaling work—namely the TradeRev posting—was done at the direction of others. Although categorized as wholesaling, Michael never posted vehicles to TradeRev himself. Michael's only involvement with the TradeRev postings was to inform Mr. Lightsey that cars had been uploaded to the application. Plaintiff's TradeRev work displaced work that would have been done by Mr. Lightsey. According to Plaintiff, much of his work (more than 50%) involved posting

13

vehicles for sale on eBay, Craigslist, and TradeRev, and he testified that he spent several hours a day on the TradeRev work. Also relevant, Plaintiff communicated with and received direction from Tim Scheid, a Fields Motorcars employee, regarding the TradeRev postings. Fields Motorcars hired Mr. Scheid to wholesale vehicles for the various stores in Florida and represent them at auction. Mr. Scheid had no authority over Michael's employment at Fields, which also suggests that the TradeRev work was beyond the scope of Plaintiff's training.

Apart from wholesaling, Plaintiff also posted vehicles for sale on eBay and Craigslist. These tasks are related to retail sales, and were also beyond the scope of Michael's work. There is also evidence that Mr. Gordon oversaw this work because Plaintiff once received a verbal warning from Mr. Gordon for spending too much money listing cars on eBay. Plaintiff testified that he spent significantly more time on these tasks than "the wholesaling business."[5]

We cannot properly weigh this factor without additional information. We also note the possibility that Plaintiff's work displaced Michael's work as well.

The seventh *Glatt* factor—entitlement to a paid job at the end of the training—does not support a finding that Plaintiff was an employee. Even weighing the evidence in the light most favorable to Plaintiff, the non-moving

_____

[5] Plaintiff appears to draw a distinction between the online postings and the wholesaling work done under Michael's supervision. For purposes of weighing this factor, the distinction is not critical but we note that the Parties agree that the TradeRev postings constitute wholesale-related work.

14

party, the record does not lead to the conclusion that Plaintiff and Fields Motorcars both understood that Plaintiff would be entitled to a paid position at the conclusion of the training.[6]

Of the four applicable factors, expectation of compensation and entitlement to a paid job at the conclusion of the training weigh in favor of finding that Plaintiff was a trainee. Because material issues of fact remain, we are unable to properly weigh the factors relating to duration and displacement of work. With the record before us, we cannot determine the primary beneficiary of this employment relationship.

Given that the *Glatt* analysis proves inconclusive, we must look to the totality of the circumstances when factors are disputed. *Layton*, 686 F.3d at 1181. This is not a situation where a trainee infrequently performed ministerial tasks during the course of a formalized training program. Plaintiff did wholesaling work for his father, but he also did wholesaling work for Mr. Lightsey, as well as other work unrelated to wholesaling. As noted above, material issues of fact remain regarding how much time Plaintiff devoted to tasks that extended beyond his training.

---

[6] Plaintiff testified that there was merely a "good chance" that Plaintiff would be hired "when and if [Michael] retired." But Plaintiff also testified that he "expected an opportunity to work full time in the future." Fields Motorcars characterizes the expectation as a possibility of future employment rather than a promise. The Court is not persuaded that Plaintiff and Fields Motorcars both understood that Plaintiff would be entitled to a paid job at the conclusion of training and any inference to the contrary would be based upon speculation.

Without knowing how much time Plaintiff spent doing tasks unrelated to wholesaling and how much time Plaintiff spent doing tasks that were related to wholesaling but not under the purview of his father, we cannot properly assess when Plaintiff was a trainee and when he was an employee. The facts here present a situation where, as this Court noted in *Schumann*, the proper outcome may not be an "all-or-nothing" determination. Material issues of fact remain and, based on the record before us, we cannot conclude that Plaintiff was not an employee at times.

## V. CONCLUSION

In light of the record and the relevant considerations, it appears that Plaintiff might have been a trainee at times and an employee at others. We vacate the district court's entry of summary judgment for Fields Motorcars and remand for further proceedings consistent with this opinion.[7]

VACATED AND REMANDED.

---

[7] In light of the issues of fact that remain regarding Plaintiff's employment status as to Fields Motorcars and Plaintiff's primary reliance upon informal guidance from the Department of Labor which has since been withdrawn, the Court need not address Plaintiff's argument that he was an employee of both his father and Fields Motorcars by virtue of vertical joint employment. *See* U.S. Dep't of Labor, https://www.dol.gov/newsroom/releases/opa/opa20170607 (news release June 7, 2017) (Last visited Oct. 2, 2017).

16