[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14044

_____

BRANDI MCKAY,

Plaintiff-Appellant,

*versus*

MIAMI-DADE COUNTY,
a Municipal Corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-20638-RNS

_____

Before JORDAN, JILL PRYOR, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

Brandi McKay appeals the District Court's summary judgment denying her claims under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*, for minimum wage and overtime payments. McKay claims that she was an employee of Miami-Dade County while she participated in the County's autopsy forensic photography training program. As we agree with the District Court that McKay was an intern, not an employee, we affirm.

## I.[1]

McKay applied for Miami-Dade County's Medical Examiner's Forensic Imaging Preceptorship Program ("the Program") in 2016. She first heard of the Program while visiting Barry College to learn about the school's forensic photography degree program. McKay ultimately elected not to apply to Barry College or any other forensic photography degree program, choosing instead to apply to Miami-Dade County's highly regarded Program and avoid "another four years of school."[2] McKay understood that the Program was free, six-months long, unpaid, and required weekend

---

[1] Unless otherwise noted, the following facts are undisputed on appeal.

[2] McKay graduated from York College of Pennsylvania in 2011 with a bachelor's degree in criminal justice and minors in photography and criminalistics.

work. When she applied, McKay had no experience with any of the state-of-the-art equipment used during the Program, other than a Nikon camera.

After some delay, McKay officially began her internship on April 15, 2019. For the first two weeks of the Program, McKay completed workbook assignments provided by the Program. During weeks three and four, McKay received training in the morgue and shadowed County staff photographers as they took forensic autopsy photographs. In weeks five through eight, McKay and another intern worked together in the morgue taking autopsy photos, sometimes with staff supervision and sometimes without. After week eight and for the remainder of her time in the Program, McKay and another intern alternated between working weeks in the morgue. On McKay's on-weeks, which included weekends, she took autopsy photographs with little supervision, unless she needed training on equipment that she had not previously used. On McKay's off-weeks, she completed assignments in the Program office. While the parties dispute the amount of feedback McKay received after week eight, they agree McKay received feedback before week eight and that McKay received no written evaluations of her performance. McKay's participation in the Program ended on September 10, 2019, about a month before her internship was scheduled to end.

McKay filed the instant suit against Miami-Dade County on February 12, 2020, seeking minimum wage and overtime payments under the FLSA. McKay claimed she was a county employee and

that the County abused the Program to "save[] labor costs." The County responded by arguing that McKay was never a county employee. The parties filed cross-motions for summary judgment on July 17, 2020; as part of these cross-motions, the parties stipulated that McKay's participation in the Program "was not motivated in any part by civic, charitable, or humanitarian reasons" and was instead solely to acquire "training in forensic photography." The District Court determined that McKay was an intern, not an employee, using the primary beneficiary test adopted by the Eleventh Circuit in *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199 (11th Cir. 2015), and so denied McKay's motion and granted the County's. McKay timely appealed.

## II.

We review the grant of summary judgment *de novo*. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018). Summary judgment is appropriate if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On summary judgment, we view the evidence and draw all reasonable inferences in the light most favorable to the non-movant. *Ware*, 906 F.3d at 1311.

## III.

To receive minimum wage and overtime payments under the FLSA, McKay must show that she is an employee within the meaning of the statute. 29 U.S.C. §§ 206(a), 207(a)(1). Unfortunately, the FLSA does not provide much guidance on who exactly

is an "employee," defining the term as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). To "employ" is defined as "to suffer or permit to work." § 203(g). "Employer," meanwhile, is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." § 203(d). While these definitions are frustratingly circular, we have held that they are intended to encompass "the broadest possible delineations of the employer-employee relationship." *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1287 (11th Cir. 2016) (citing *United States v. Rosenwasser*, 323 U.S. 360, 362–63 & n.3, 65 S. Ct. 295, 296–97 & n.3 (1945)). This "broad general definition" thus "strongly suggests that Congress intended an all encompassing definition of the term 'employee' that would include all workers not specifically excepted." *Patel v. Quality Inn S.*, 846 F.2d 700, 702 (11th Cir. 1988).

Miami-Dade County contends that two such exceptions apply to McKay's participation in the Program: the volunteer exception for public agencies found in § 203(4)(A) and the internship exception established by Supreme Court and Eleventh Circuit caselaw. *Schumann*, 803 F.3d at 1208–12 (citing *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152–53, 67 S. Ct. 639, 641 (1947)). McKay responds that Congress replaced the internship exception with the volunteer exception for public agencies when it amended the FLSA in 1985, and that McKay was not a volunteer under the statute. In Part A, we discuss the relationship between the caselaw internship exception and the statutory volunteer exception and

conclude that both exceptions apply to public agencies.  In Part B, we analyze whether McKay was a volunteer or an intern under these exceptions and conclude that she was an intern but not a volunteer.

A.

To understand why both the caselaw internship exception and the statutory volunteer exception apply to public agencies, we begin by discussing the history and purposes of both exceptions. "Congress enacted the FLSA in 1938 with the goal of 'protecting all covered workers from substandard wages and oppressive working hours.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147, 132 S. Ct. 2156, 2162 (2012) (alteration adopted) (quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739, 101 S. Ct. 1437, 1444 (1981)); *see also* 29 U.S.C § 202(a).  While the Supreme Court had previously held that FLSA exceptions "must . . . be narrowly construed" to give effect to the FLSA's "humanitarian and remedial" purposes, *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S. Ct. 807, 808 (1945), the Court has recently rejected that view, opting instead to interpret the FLSA "fair[ly]." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018); *Ramirez v. Statewide Harvesting & Hauling*, 997 F.3d 1356, 1359 (11th Cir. 2021).  With the Supreme Court's instruction to give the FLSA a "fair reading" in mind, we turn to the two exceptions under consideration. *Encino Motorcars*, 138 S. Ct. at 1142.

The internship exception derives from *Portland Terminal*, a 1947 Supreme Court case concerning whether railroad trainees

were employees under the FLSA. 330 U.S. at 149–150, 67 S. Ct. at 640. In *Portland Terminal*, a railroad company offered an unpaid, weeklong training course for prospective yard brakeman. *Id.* at 149, 67 S. Ct. at 640. The railroad required that all prospective yard brakeman complete this training course to be considered for employment. *Id.* Upon satisfactory completion of the training course, trainee brakemen were certified by the railroad and then placed on a list of qualified workers. *Id.* at 150, 67 S. Ct. at 640. To decide whether these trainees were employees, the Supreme Court began by holding that common law definitions of "employer" and "employee" were inapplicable, because the FLSA contained its own broad definitions. *Id.* at 150–51, 67 S. Ct. at 640. Accordingly, the Court analyzed the statutory definition of "employ," "to suffer or permit to work," and held that it was "obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Id.* at 152, 67 S. Ct. at 641; *see also* § 203(g). The Court then analogized the railroad's training course to public and private vocational school programs, holding that the FLSA "was not intended to penalize railroads for providing, free of charge, the same kind of instruction [as a school] at a place and in a manner which would most greatly benefit the trainees." *Portland Terminal*, 330 U.S. at 152–53, 67 S. Ct. at 641. Sixty-eight years later, this Court applied *Portland Terminal* to modern intern-employer relationships and held that interns, students, and other trainees who were the primary beneficiaries of a training or educational program were not employees under the FLSA.

*Schumann*, 803 F.3d at 1208–12.[3]  While *Schumann* and *Portland Terminal* concerned programs run by private enterprises, neither of these cases explicitly limited the internship exception to private enterprises. *See generally id.*; *see generally Portland Terminal*, 330 U.S. at 152–53, 67 S. Ct. at 641.  Further, the FLSA does not differentiate between public and private work in the definition of "employ." § 203(g).

In contrast, the statutory volunteer exception for public agencies is the result of a twenty-year long debate between Congress and the Supreme Court about how far Congress could and should extend the FLSA to the states.  When the FLSA first passed in 1938, Congress excluded both the federal and state governments from the FLSA's definition of "employer."  FLSA, Pub. L. No. 75-718, ch. 676, § 3(d), 52 Stat. 1060, 1060 (1938) (codified as amended at § 203(d)) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but shall not include the United States or any State or political subdivision of a State.").  This changed in 1966, when Congress amended the FLSA to cover state employees who worked in certain hospitals, institutions, schools, and railways.  Fair Labor Standards Amendments of 1966, Pub. L. No. 89-601, § 102(b), 80 Stat.

---

[3] In doing so, we adopted the primary beneficiary test proposed by the Second Circuit in *Glatt v. Fox Searchlight Pictures, Inc.*, 791 F.3d 376, 384 (2d Cir. 2015).  The 2015 *Glatt* decision was later vacated and replaced by *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016).  The 2016 *Glatt* decision also adopted the primary beneficiary test. *Glatt*, 811 F.3d at 536–37.

830, 831 (1966) (codified as amended at § 203(d)). This extension of FLSA coverage to the states was promptly challenged and reached the Supreme Court two years later in *Maryland v. Wirtz*, 392 U.S. 183, 88 S. Ct. 2017 (1968). The *Wirtz* Court upheld the 1966 extension under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, holding that "[i]f a State is engaging in economic activities that are validly regulated by the Federal Government when engaged in by private persons, the State too may be forced to conform its activities to federal regulation." *Wirtz*, 392 U.S. at 197, 88 S. Ct. at 2024.

In 1974, Congress once again amended the FLSA. This time, Congress entirely removed the state exemption from the definition of "employer," choosing instead to specifically include state "public agenc[ies]" as employers in the definition. Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, § 6, 88 Stat. 55, 58 (1974) (codified at § 203(d)). Consequently, the FLSA was extended to state employees with only a few narrow statutory exceptions. § 203(e)(2). Congress's intent was thwarted, however, when the Supreme Court overruled *Wirtz* two years later in *Nat'l League of Cities v. Usery*, 426 U.S. 833, 855, 96 S. Ct. 2465, 2476 (1976). In *National League*, the Supreme Court held that the 1966 and 1976 amendments to the FLSA were outside of Congress's authority under the Commerce Clause insofar as they "operate[d] to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions." *Nat'l League*, 426 U.S. at 852, 96 S. Ct. at 2474. Relevantly, the *National League* Court's

decision was based in part on its concern that the extension of the FLSA to the states would result in "a significant reduction of traditional volunteer assistance which has been in the past drawn on to complement the operation of many local governmental functions."[4]  *Id.* at 850–51, 96 S. Ct. at 2474.

On February 19, 1985, the Supreme Court changed its mind again, overruling *National League* and holding that the 1966 and 1974 FLSA amendments were a valid exercise of Congress's power under the Commerce Clause. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 533–34, 557, 105 S. Ct. 1005, 1008–09, 1021 (1985).  According to the *Garcia* Court, state representatives in Congress would ensure "that laws that unduly burden the States will not be promulgated." *Id.* at 556, 105 S. Ct. at 1020.  As a result of *Garcia*, the Department of Labor ("DOL") announced on June 14, 1985, that it would begin enforcing the FLSA against the states on October 15, 1985, with liability for wage and overtime payments

---

[4] Justice Brennan noted in his dissent that Department of Labor regulations already exempted fire protection and law enforcement volunteers from the requirements of the FLSA. *Nat'l League*, 426 U.S. at 874 n.12, 96 S. Ct. at 2485 n.12 (Brennan, J., dissenting) (citing 29 C.F.R. § 553.11 (1975)).  Labor regulations also provided a general exception to public and private employees who voluntarily engaged in civic or charitable work.  29 C.F.R. § 785.44 (1985).  But as the *National League* Court pointed out, who exactly qualifies as a volunteer under these regulations would be subject to judicial determination.  *Nat'l League*, 426 U.S. at 850, 96 S. Ct. at 2473–74.  And, of course, it was no sure thing that those regulations would have been upheld as a valid interpretation of the FLSA as it then existed.

to be backdated to April 15, 1985, the day *Garcia*'s mandate issued. U.S. Dept. of Labor, *Labor Department to Start Investigations of State, Local Governments under Federal Wage-Hour Law*, USDL 85-249 (June 14, 1985). Congress, meanwhile, began preparing legislation to deal with the sudden, unexpected extension of the FLSA to the states. This legislation resulted in the Fair Labor Standards Amendments of 1985, which included, *inter alia*,[5] the statutory volunteer exception now codified at § 203(e)(4). Pub. L. No. 99-150, §4(a), 99 Stat. 787, 790 (1985). Through this legislation, Congress addressed the concerns raised by the *National League* Court about the impact of the FLSA on state and local volunteerism. *Nat'l League*, 850–51, 96 S. Ct. at 2473–74; S. Rep. No. 99-159, at 14 (1985) ("The Committee does not intend to discourage or impede volunteer activities undertaken for humanitarian purposes.").

After giving the FLSA a "fair reading," *Encino Motorcars*, 138 S. Ct. at 1142, we conclude that the internship and volunteer exceptions are both applicable to public agencies. The internship exception derives from the statutory definition of "employ," which the Supreme Court held "was obviously not intended to stamp all persons as employees who, without any express or implied

---

[5] The 1985 amendments also added provisions addressing state employee overtime, fire protection and law enforcement, occasional or sporadic state employment, and substitutions, along with removing FLSA liability accrued before April 15, 1986, by state agencies that were exempted from the FLSA under the *National Court* decision. Fair Labor Standards Amendments of 1985, Pub. L. No. 99-150, §§ 3(a)–(c), 4(a), 99 Stat. 787, 789–90 (1985).

compensation agreement, might work for their own advantage on the premises of another." *Portland Terminal*, 330 U.S. at 152, 67 S. Ct. at 641. In other words, someone "whose work serves only his own interest" has not been "suffer[ed] or permit[ed] to work," and thus has not been employed. *Id.* (quoting § 203(g)). As an "employee" under the FLSA is "any individual employed by an employer," § 203(e)(1), the failure of interns and trainees to be "employed" means they cannot be employees within the meaning of the FLSA. And in this circuit, we analyze whether an intern or trainee was "employed" using the primary beneficiary test. *Schumann*, 803 F.3d at 1208–12.

The volunteer exception, meanwhile, exempts certain individuals who would otherwise be employees from the FLSA's definition. § 203(e)(1) (noting that the term "employee" excludes individuals who meet certain prescribed exceptions, including the volunteer exception); § 203(e)(4)(A) ("The term 'employee' does not include any individual who volunteers to perform services for a public agency . . . ."). So, the plain meaning of § 203(e)(1) reveals that an employee is an individual who (1) does not meet any of the listed statutory exceptions and (2) is "employed by an employer." Since the volunteer exception is a listed statutory exception while the internship exception is drawn from statutory interpretation of the term "employ," the creation of the volunteer exception did not limit or otherwise affect the applicability of the internship exception.

This reading of the statute is further confirmed by the legislative history of the 1985 amendments, which communicated Congress's intent to discharge its "responsibility to ensure that federal legislation does not undermine the states' 'special position' or 'unduly burden the states'" and "to further the principles of cooperative federalism." S. Rep. No. 99-159, at 7 (quoting *Garcia*, 469 U.S. at 547, 556, 105 S. Ct. at 1015, 1020). Congress passed the 1985 amendments to "clarify the application of the [FLSA] to volunteers" in the wake of shifting Supreme Court caselaw, not to exclude the states from then-existing FLSA exceptions. *Id.* at 1. Further, the two exceptions serve distinctly different purposes; the volunteer exception allows public agencies to accept the services of volunteers without having to treat them as employees, while the generally applicable internship exception allows all employers to provide training and education without having to pay their interns and trainees a wage. McKay's argument that the volunteer exception displaced the internship exception for state public agencies is thus unsupported by the plain text of the FLSA, the legislative history, and the purposes of the two exceptions.

Accordingly, Miami-Dade County can challenge the employee-status of McKay either by establishing that a listed statutory exception, such as the volunteer exception, applies to her, or by showing that McKay was an intern under the primary beneficiary test and so was never employed. We begin by analyzing whether McKay was a volunteer.

*B.*

i.

The FLSA excludes "volunteers" from the definition of "employee," stating that:

> (A) The term "employee" does not include any individual who volunteers to perform services for a public agency which is a State, a political subdivision of a State, or an interstate governmental agency, if—
>
> > (i) the individual receives no compensation or is paid expenses, reasonable benefits, or a nominal fee to perform the services for which the individual volunteered; and
> >
> > (ii) such services are not the same type of services which the individual is employed to perform for such public agency.

§ 203(e)(4)(A). The FLSA does not define who "volunteers" are. Instead, the DOL provides the following definition of a "volunteer":

> An individual who performs hours of service for a public agency for civic, charitable, or humanitarian reasons, without promise, expectation or receipt of compensation for services rendered, is considered to be a volunteer during such hours.

29 C.F.R. § 553.101(a).

McKay argues that the DOL's definition of "volunteer" deserves deference under *Chevron, U.S.A., Inc., v. Nat. Res. Def.*

*Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984). Under *Chevron*, courts are bound to accept agency constructions of statutes so long as the statute is ambiguous and the agency's construction is permissible. *Id.* at 842–43, 104 S. Ct. at 2781–82. As the parties have stipulated that McKay did not participate in the Program for "civic, charitable, or humanitarian reasons," even in part, the DOL definition would exclude McKay from the volunteer exception.

Miami-Dade County responds by arguing that the DOL definition is "not supported by existing law." Appellee Br. at 11. Instead, the County urges us to adopt a definition based on "common sense" and "reasonableness." *Id.* at 10–12. The County suggests that it is unreasonable for an unpaid, public agency intern to not be a volunteer. *Id.* While the County's brief never directly addressed *Chevron*, the County clarified at oral argument that it believes the statutory meaning of "volunteer" to be unambiguous. Oral Arg. at 20:31–21:31. Based on the County's brief, we infer that the County believes any individual who works for a public agency without payment to be a volunteer under the FLSA.

We disagree. Miami-Dade County's proposed definition posits that anyone a public agency chooses not to pay is *ipso facto* a volunteer. However, this reading ignores a primary purpose of the FLSA, "protect[ing] all covered workers from substandard wages and oppressive working hours.'" *Christopher*, 567 U.S. at 147, 132 S. Ct. at 2162 (internal quotation marks omitted); *see also* § 202(a). As detailed above, Congress chose to extend the FLSA to the states after initially exempting them. Further, Congress chose

not to withdraw this extension after *Garcia*, instead opting to create a volunteer exception. By applying the FLSA to the states, Congress ensured that state employees would receive a "fair day's pay for a fair day's work." *Barrentine*, 450 U.S. at 739, 101 S. Ct. at 1444 (quoting 81 Cong. Rec. 4983 (1937) (message of President Franklin D. Roosevelt)); *see also* § 206(a). The County's proposed definition undercuts a primary purpose of the FLSA by allowing states to ignore the statute as to anyone the state can convince to work without pay.

Further, the Senate committee report recommending the 1985 FLSA amendments explicitly directed the DOL to issue regulations concerning the volunteer exception. S. Rep. No. 99-159, at 14 ("The DOL is directed to issue regulations providing further guidance in this area."). This indicates that Congress considered the term "volunteer" to be ambiguous and left a gap for the DOL to fill. *See United States v. Mead Corp.*, 533 U.S. 218, 227, 121 S. Ct. 2164, 2171 (2001) ("When Congress has 'explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." (internal citation omitted) (quoting *Chevron*, 467 U.S. at 843–44, 104 S. Ct. at 2782)).

As "volunteers" cannot refer to anyone who works for a public agency without pay, there must be some limiting principle not expressed in § 203(e)(4)(A). This makes the term ambiguous,

and so *Chevron* requires us to defer to the DOL's definition unless it is "arbitrary, capricious, or manifestly contrary to the statute." 467 U.S. at 844, 104 S. Ct. at 2782. The DOL chose to limit the term "volunteer" to those who serve for "civic, charitable, or humanitarian purposes." § 553.101(a). We cannot say that the DOL's definition, which adopts and expands upon language used in the Senate committee report recommending the 1985 FLSA amendments after considering the matter through formal rulemaking, is unreasonable, or otherwise arbitrary, capricious, or contrary to the purposes of § 203(e)(4)(A). S. Rep. No. 99-159, at 14 ("The committee does not intend to discourage or impede volunteer activities undertaken for humanitarian purposes."). Accordingly, we defer to the DOL's definition of "volunteer" under *Chevron*. *See Brown v. NYC Dep't of Educ.*, 755 F.3d 154, 161 n.4 (2d Cir. 2014) (granting *Chevron* deference to § 553.101(a)); *Purdham v. Fairfax Cnty. Sch. Bd.*, 637 F.3d 421, 428 (4th Cir. 2011) (applying the DOL's definition to interpret § 203(e)(4)(A)); *Cleveland v. City of Elmendorf*, 388 F.3d 522, 528–29 (5th Cir. 2004) (same); *Mendel v. City of Gibraltar*, 727 F.3d 565, 570 (6th Cir. 2013) (recognizing that the DOL's regulation defining volunteers provides "guidance").

We agree with our sister circuits that a "volunteer" under § 553.101(a) need only be motivated in part by "civic, charitable, or humanitarian purposes." *Brown*, 755 F.3d at 161 & n.6; *Purdham*, 637 F.3d at 429; *Cleveland*, 388 F.3d at 528–29. However, the parties have stipulated that McKay "was not motivated in any part by civic, charitable, or humanitarian reasons." Accepting the parties'

18                    Opinion of the Court                    20-14044

stipulation as fact, we hold that McKay was not a volunteer within the meaning of § 203(e)(4)(A) while she participated in the Program. *United States v. Zayas-Morales*, 685 F.2d 1272, 1278 (11th Cir. 1982) (noting that the "stipulation of facts resolve[] any questions of material fact").

ii.

Because McKay does not qualify as a volunteer under the volunteer exception, we now turn to the internship exception.[6] Under the internship exception, an intern learning under an employer is not considered "employed" by the FLSA so long as the intern is the primary beneficiary of the relationship. *Schumann*, 803 F.3d at 1211. To determine who the primary beneficiary of an intern-employer relationship is, we look to seven non-exhaustive factors:

---

[6] McKay argues that Miami-Dade County waived the internship exception in the District Court by stating that "McKay's participation in the [Program] is not subject to the primary beneficiary test applicable to internships with for-profit employers" in the County's motion for summary judgment. Appellant Br. at 28–31. However, in its motion the County then proceeded to analyze McKay's relationship with the County under *Schumann*'s primary beneficiary test and conclude that the County was entitled to summary judgment under the *Schumann* factors. Further, the County's statement that the primary beneficiary test does not apply was based on a non-binding fact sheet issued by the DOL—in other words, the County was merely bringing the DOL's factsheet to the District Court's attention. So, we conclude that the County did not waive the internship exception.

1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation.  Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.

3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without

entitlement to a paid job at the conclusion of the internship.

*Id.* at 1211–12.  Under this test, "no one factor is dispositive and every factor need not point in the same direction for the court to conclude that the intern is not an employee."  *Id.* at 1212 (quoting *Glatt*, 791 F.3d at 384 (internal alterations omitted)).  "Rather, courts must engage in a 'weighing and balancing of all of the circumstances,' including, where appropriate, other considerations not expressed in the seven factors."  *Id.* (quoting *Glatt*, 791 F.3d at 384 (alterations omitted)).[7]

---

[7] The dissent argues that McKay was not an intern under *Schumann* because she did not receive academic credit or obtain a professional certification or licensure from her participation in the Program, and so the *Schumann* test does not apply.  Dissent. Op. at 4–7.  Instead, the dissent suggests we use a "totality of the circumstances" test to analyze whether McKay was a "trainee" under *Portland Terminal* or an employee.  *Id.* at 7–12.  We disagree with the dissent's proposed test for two reasons.

First, McKay did not receive academic credit or professional certification or licensure from her time in the Program only because she used the Program as a substitute for formal education.  As McKay stipulated, she chose the Program over Barry College or any other forensic degree program to avoid "another four years of school."  She did this because the Program functions as a free six-month vocational school in all but name.  Accordingly, the internship test we apply to other interns seeking educational and professional advancement (and which the dissent would apply to other Program participants receiving academic credit, *id.* at 7 n.4) should apply to her.

Nor is this the first time we have applied the *Schumann* test to a learner receiving valuable training without participation in a formal degree program.  In the only other case where this Court has analyzed the *Schumann*

Using the *Schumann* factors, the District Court found that McKay was the primary beneficiary of her relationship with the Program and therefore an intern, not an employee. As the parties agree that McKay understood there was no promise or expectation of compensation for her participation in the Program, the Court found that the first factor weighed in Miami-Dade County's favor. Likewise, the Court found that the second factor weighed "heavily" in the County's favor as McKay's participation in the Program

---

factors, we applied them to a son who learned automobile wholesaling by shadowing his father for fifteen months because "the *Schumann* approach provide[d] the most applicable guidance for the employment relationship at hand." *Axel v. Fields Motorcars of Fla., Inc.*, 711 F. App'x 942, 945–49 (11th Cir. 2017). Just so here.

Second, the *Schumann* test *is* a "totality of the circumstances" test, just as the dissent would like us to apply. The factors are non-exhaustive and generally applicable, intended mostly to provide clear signposts by which courts and juries may conduct their analysis. Just because the third and fourth *Schumann* factors apply only to students does not mean we should "throw the baby out with the bathwater" and deem the test wholly inapplicable. Instead, we should simply deem those specific factors inapplicable. *See id.* at 947 (applying *Schumann* while noting that the student-related *Schumann* factors were inapplicable in the non-academic context as "they are tailored to training in the context of a formal academic program"). The dissent admits as much, stating that its "approach is not completely at odds with *Schumann* and *Glatt*, both of which take into account all the relevant circumstances." Dissent. Op. at 9 (internal citations omitted). Indeed, the dissent's analysis largely follows the *Schumann* test's factors, with particular focus on the fifth and six factors. *See id.* at 22–28. Any "comparative benefits" calling the *Schumann* test a "totality of the circumstances" test may offer, *see id.* at 9, would be far outweighed by the confusion that would inevitably stem from such a free-wheeling, factor-less approach.

provided her with valuable training similar to what she would have received in a formal forensic degree program. In fact, McKay chose to participate in the Program in lieu of a formal degree program to avoid "another four years of school." The Court also found that the seventh factor weighed in favor of the County, as McKay did not expect a job with the County following her internship.

Since McKay chose to participate in the Program instead of pursuing a formal degree, the District Court did not analyze the third and fourth factors, as they were inapplicable to McKay's situation.[8] The Court then found that the fifth factor weighed "very

---

[8] The dissent contends that if the *Schumann* test applies, we should weigh the third and fourth factors in McKay's favor instead of "zero[ing]" the factors out. Dissent. Op. at 7. But the dissent's approach disregards how the third and fourth factors operate. Boiled down, these two factors address the degree to which an internship is integrated with and accommodates a student intern's education program. Without a formal education program, there is nothing to integrate or accommodate. The factors are simply inapplicable. *See Axel*, 711 F. App'x at 947.

   For example, consider an internship undertaken to complete professional licensure or certification requirements after the intern's formal educational program has ended. The dissent agrees with us that the employee-status of such an intern would be analyzed under the *Schumann* test. *See* Dissent. Op. at 4, 6–9, 15, 22; *but see id.* at 5 n.2. But that intern is no longer a student, so there is no academic program to integrate or accommodate. Does the lack of an academic program in that internship make the intern any more or less likely to actually be an employee? No. The intern in that scenario is still seeking the education and experience necessary to pursue the intern's professional goals—that is, the intern is still "work[ing] for their own advantage

weakly, if at all, in favor of Ms. McKay." While the Program was arguably longer than necessary to train McKay, *Schumann* stated that "designing an internship is not an exact science" and so the proper test for the fifth factor is "whether the duration of the internship is grossly excessive in comparison to the period of beneficial learning." 803 F.3d at 1213–14. As the first month of the Program consisted solely of hands-on training and training continued for the remainder of the Program through staff supervision and off-week workbook assignments, the Court found that the Program was not necessarily "grossly excessive."

The District Court also found that the sixth factor weighed weakly in favor of McKay. The parties agree that McKay did perform work without staff supervision and worked weekends, but disagree about the extent to which McKay and other interns displaced staff photographers. As the Court had to construe the facts in the light most favorable to McKay on summary judgment, it

_____

on the premises of another." *Portland Terminal*, 330 U.S. at 152, 67 S. Ct. at 641.

The same is true of McKay's participation in the Program. As McKay put it in her statement of undisputed material facts, "McKay participated in the [Program] with the goal of acquiring training in forensic photography that would help her develop specialized photography skills, and thus enhance her employability. That was her sole motivation for participating in the [Program]." Like the non-student intern completing a requirement for licensure or certification, McKay participated in the Program to advance her professional goals without pursuing a degree program. So, the third and fourth factors are just as inapplicable to McKay as they are to the intern seeking licensure.

found that her participation in the Program did displace staff photographers. However, the Court also noted that "there is nothing inherently wrong with an employer's benefiting from an internship that also plainly benefits the interns," *Schumann*, 803 F.3d at 1211, and so concluded that the sixth factor had little weight under these facts.

After considering the applicable *Schumann* factors, the District Court found that the "clear economic reality of the relationship between the County and Ms. McKay" was that McKay's "free internship allowed her to develop skills in forensic photography over a short period of time, imparting a significant benefit to her." Accordingly, the Court concluded that McKay was an intern, not an employee, and so not entitled to minimum wage and overtime payments under the FLSA.

We agree with the District Court's analysis. The undisputed facts show that McKay learned forensic photography from a highly regarded county program for free and over a six-month period, thereby gaining considerable experience comparable to a four-year degree. And in participating in the Program, McKay clearly understood that she would not be paid and that she was not entitled to a job with Miami-Dade County following her internship. Additionally, the fifth factor provides little if any support for McKay's position, as the Program's six-month duration was simply not grossly excessive, especially in comparison with a four-year program. McKay gained both valuable practical experience and training from forensic photography professionals and Program assignments

throughout the entirety of her participation.    Likewise, the County's receipt of some benefit from McKay's internship under the sixth factor does not, standing alone and under these facts, transform the County into the primary beneficiary of its relationship with McKay.[9]   Therefore, we agree with the District Court

_____

[9] The dissent essentially takes issue with our analysis of the fifth and sixth *Schumann* factors, arguing that a jury could determine that McKay was an employee due to the length of the Program and the benefits McKay provided Miami-Dade County during the Program.    *See* Dissent. Op. at 22–28.   Of course, the dissent does not describe its analysis in terms of the *Schumann* factors because the dissent argues *Schumann* is only applicable to student "interns," not non-student "trainees." *Id.* at 4–7; *see supra* note 7.   Had the dissent addressed *Schumann*, it would have come across the "guidance on applying some of the factors" that *Schumann* provides.   803 F.3d at 1213.   As *Schumann* explains, the fifth factor—the length of the internship—is not an "exact science," and the question is whether the internship is "grossly excessive in comparison to the period of beneficial learning." *Id.* at 1213–14.   The dissent—which does not address the proper "grossly excessive" standard—contends a jury could find McKay was employed (and her period of beneficial learning ended) after the first month of the Program.   Dissent. Op. at 28.   In other words, the dissent would create an "exact science" standard for internship programs, in contravention of *Schumann*'s guidance.   Such an approach would impose an undue burden on internship programs.

Likewise, the dissent does not address *Schumann*'s statement that "the mere fact that an employer obtains a benefit from providing a[n] . . . internship does not mean that the employer is the 'primary beneficiary' of the relationship." 803 F.3d at 1213.   While we agree with the dissent that the sixth factor favors McKay on summary judgment, this statement lessens its value, especially when standing alone.   As *Schumann* explained, "no one factor is dispositive and every factor need not point in the same direction for the court to conclude that the intern is not an employee." *Id.* at 1212 (internal alterations

26                    Opinion of the Court                    20-14044

that there is no material question of fact about whether McKay was an intern—she was.

## IV.

As McKay was an intern, not an employee, she is not entitled to minimum wage or overtime payments under the FLSA. §§ 206(a), 207(a)(1). Accordingly, we affirm the judgment of the District Court.

**AFFIRMED.**

---

omitted). In other words, the sixth factor alone cannot get McKay past summary judgment, at least on these facts.

20-14044            JORDAN, J., Concurring                1

JORDAN, Circuit Judge, Concurring in Part and Dissenting in Part:

I agree that Ms. McKay is not a volunteer under 29 U.S.C. § 203(e)(4)(A) and 29 C.F.R. § 553.101(a), and join Parts II, III.A, and III.B.i of the court's opinion. But I respectfully dissent from Parts I and III.B.ii. Viewed in the light most favorable to Ms. McKay, the evidence and inferences create a jury question as to whether Ms. McKay comes within the trainee exception to the FLSA set out in *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947), for all of the time she worked in Miami-Dade County's Forensic Imaging Preceptorship Program.

## I

*Portland Terminal* is critical to analyzing Ms. McKay's FLSA claim. I therefore begin by setting out its facts and rationale in detail.

## A

The case involved a claim for wages under the FLSA by prospective yard brakemen who took a seven- to eight-day "course of practical training" provided by a railroad. 330 U.S. at 149. The training was required for permanent employment with the railroad. *See id.* Once accepted for the course, trainees were "turned over to a yard crew for instruction," and "then gradually [were] permitted to do actual work under close scrutiny." *Id.* The trainees' activities "d[id] not displace any of the regular employees, who d[id] most of the work themselves," and who had to "stand immediately by to supervise whatever the trainees d[id]." *Id.* at 149–50.

The trainees' work did "not expedite the company business, but [could], and sometimes d[id], actually impede it and retard it." *Id.* at 150. If the trainees "complete[d] their course of instruction satisfactorily and [were] certified as competent," their names were placed on a list from which the railroad could "draw when their services we[re] needed." *Id.* Unless they completed the course and were certified as competent, the trainees were not put on the list. *See id.* They received no pay or allowance for the training course, and did not expect any such renumeration. *See id.*

Based on these facts, the Supreme Court held that the railroad trainees were not employees under the FLSA. Though "[w]ithout doubt" the FLSA "covers trainees, beginners, apprentices, or learners if they are employed to work for an employer for compensation," the phrase "suffer or permit to work" in the FLSA "was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Id.* at 151–52. There was no indication that Congress intended the FLSA to cover persons "who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit." *Id.* at 152.

The FLSA's language, though broad, could "not be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction." *Id.* If the trainees were taking similar courses of

instruction at a vocational school, they would not be thought of as employees. *See id.* at 152–53. The FLSA, said the Court, "was not intended to penalize railroads for providing, free of charge, the same kind of instruction at a place and in a manner which would most greatly benefit the trainees." *Id.* at 153. Finally, the Court pointed out that "the railroads receive[d] no 'immediate advantage' from any work done by the trainees." *Id.*[1]

## B

Internships and externships in the academic setting "provide opportunities for students to observe and learn from real-life experiences at field placements[.]" Lauren K. Knight, *The Free Labor Standards Act? A Look at the Ongoing Discussion Regarding Unpaid Legal Internships and Externships*, 44 U. Balt. L. Rev. 21, 27 (2014). Student externs receive academic credit, usually have to complete a classroom or educational component led by a faculty member, and generally cannot accept compensation. *See id.* Student interns, on the other hand, do not obtain academic credit, generally do not have faculty supervision, and can be paid. *See id.*; Cynthia Anne Baker, *Externships: Teaching, Practice, and the*

---

[1] The Supreme Court came to the same conclusion in *Walling v. Nashville, C. & St. L. Ry.*, 330 U.S. 158, 160 (1947), a companion case to *Portland Terminal* involving persons training to become railroad firemen, brakemen, and switchmen. Before *Portland Terminal*, we had held that trainees of a terminal company who worked alongside a full crew for a training period averaging about a week were not employees under the FLSA. *See Walling v. Jacksonville Terminal Co.*, 148 F.2d 768, 769–71 (5th Cir. 1945).

4                    JORDAN, J., Concurring                    20-14044

*Buildable Hour*, 51 Ind. L. Rev. 428, 433 (2018); Nancy M. Maurer & Liz Ryan Cole, *Design, Teach and Manage: Ensuring Educational Integrity in Field Placement Courses*, 19 Clinical L. Rev. 115, 120 & n.12 (2012).

In *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1211–12 (11th Cir. 2015), we adopted a modified *Portland Terminal* multi-factor test to evaluate FLSA claims by externs and interns. That case involved nursing students in a master's degree program at a for-profit institution who worked at an anesthesia facility to complete the clinical experience required for certified registered nurse anesthetists to become licensed in Florida. And we emphasized several times that our opinion (and the modified *Portland Terminal* test we adopted) was limited to "the modern internship as a requirement for academic credit and professional certification and licensure." *Id.* at 1213. *See also id.* at 1203 ("[W]e now adopt an application of *Portland Terminal*'s 'primary beneficiary' test specifically tailored to account for the unique qualities of the type of internship at issue in this case."); *id.* at 1211 ("Longer-term, intensive modern internships that are required to obtain academic degrees and professional certification and licensure in a field are just too different from the short training class offered by the railroad in *Portland Terminal* for the purpose of creating its own labor pool.").

*Schumann* agreed with and relied on a Second Circuit case, *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016). Importantly, *Glatt* similarly concerned internships by current or

20-14044                    JORDAN, J., Concurring                    5

recently-graduated students and its test was likewise confined to that setting.[2] *See id.* at 537 ("The approach we adopt . . . reflects a central feature of the modern internship—the relationship between the internship and the intern's formal education—and is confined to internships and does not apply to training programs in other contexts. The purpose of a *bona-fide* internship is to integrate classroom learning with practical skill development in a real-world setting. . . . By focusing on the educational aspects of the internship, our approach better reflects the roles of internships in today's economy[.]").[3]

---

[2] According to the majority, we all agree that unpaid recent graduates—just like student interns—are properly analyzed under the *Glatt* and *Schumann* test. I think that is a mischaracterization of our discussion of *Glatt* in *Schumann*. It is true that *Glatt* concerned both students and recent graduates and noted that "all of the plaintiffs were enrolled in or had recently completed a formal course of post-secondary education." 811 F.3d at 537. But *Glatt* remanded the case to the district court to apply its new six-factor test in the first instance, suggesting that it "may" consider additional "evidence on Glatt's and Footman's formal education." *Id.* at 538. The Second Circuit did not rule, as a matter of law, that the internships of current students and recent graduates are the same. They very well may be, if the FLSA permits a recent graduate to have a short, unpaid stint at a company immediately after graduation in order to obtain necessary work experience. But that is very different from Ms. McKay, whose time working for Miami-Dade County was not very short, lasted far longer than her training, and started about eight years after her graduation from college.

[3] *Schumann* cited to the initial *Glatt* decision, which was later superseded by the version quoted above. *See Glatt v. Fox Searchlight Pictures, Inc.*, 791 F.3d 376 (2d Cir. 2015).

Two of the non-exclusive factors we laid out in *Schumann* concern the connection of the internship to the student's academic studies and curriculum. Factor 3 is "the extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit;" Factor 4 is "the extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar." *See Schumann*, 803 F.3d at 1212.

Determining employee status under the FLSA by mere reference to labels used by the parties is not appropriate, *see Eberline v. Douglas J. Holdings, Inc.*, 982 F.3d 1006, 1013 (6th Cir. 2020), but it seems to me important that Ms. McKay is not the academic extern/intern that *Schumann* and *Glatt* were concerned with. First, she graduated from college in 2011, and began the FIPP about eight years later in 2019. *See* McKay Dep., D.E. 26-1, at 12, 20. Second, there is no indication in the record that the FIPP was in any way related to or connected to any current or future academic ventures or goals. Third, she did not need to complete the FIPP as a condition of securing professional licensure or certification or obtaining employment as a forensic/autopsy photographer. *See* D.E. 30 at ¶ 6. I would therefore not use the modified *Portland Terminal* test as set out in *Schumann* and *Glatt* here. *See generally* 1 Ellen C. Kearns et al., The Fair Labor Standards Act, Chapter III.C, at 3-39 to 3-51 (ABA Section of Labor and Employment Law 3d ed. 2015

& Cum Supp. 2019) (discussing externs and interns as a separate sub-category of trainees).[4]

Setting out a test is, of course, only a starting point; how a test is applied often matters more than how it is phrased. Even if the *Schumann* test were a good fit here, I would not apply it in the same way as the court. The court dismisses Factors 3 and 4—quoted above—and says that they are inapplicable because Ms. McKay is not enrolled in any academic courses related to the FIPP. That does not seem right. If the *Schumann* test is going to be used outside of its intended academic extern/intern setting then Factors 3 and 4, rather than being zeroed out in a case like this one, need to be weighed in favor of Ms. McKay and point to the applicability of the FLSA. Where there is no academic, licensure, or certification connection whatsoever, the person who is performing work in a long-term training program at some point starts to look more like an employee under the modified *Portland Terminal* test announced in *Schumann*. By eliminating Factors 3 and 4, the court improperly stacks the *Schumann* test against an FLSA trainee like Ms. McKay and in favor of the defendant who is opposing employee classification.

## II

---

[4] On the other hand, I believe the *Schumann/Glatt* test would apply to students who were participating in the FIPP as externs or interns while pursuing their college degrees or fulfilling requirements for professional licensure or certification.

Whether or not we apply *Schumann*, we should not affirm the grant of summary judgment in favor of Miami-Dade County. On this record, a jury should decide whether Ms. McKay was an employee for purposes of the FLSA during a part of the FIPP.

## A

If *Schumann* does not govern, what standard should we use?

As noted, Ms. McKay's work in the FIPP has no educational component or connection. She participated in the FIPP years after graduating from college to obtain job experience through training. Because Ms. McKay was not an academic extern or intern, and was not participating in the FIPP to obtain licensure or certification, I propose that we simply analyze her status by assessing the totality of the circumstances under *Portland Terminal*. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729–30 (1947) (citing *Portland Terminal* and addressing whether workers at a slaughterhouse were employees or independent contractors: "We think . . . that the determination of the relationship does not depend on . . . isolated factors but rather upon the circumstances of the whole activity."). That holistic approach focuses on the economic realities of the particular situation. *See Tony and Susan Alamo Foundation v. Sec'y of Labor*, 471 U.S. 290, 301 (1985) ("[T]he test of employment under the Act is one of 'economic reality[.]'"); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 470 (11th Cir. 1982) ("It is well-established that the issue of whether an employment relationship exists under the FLSA must be judged by the 'economic realities' of the individual case."); *Brennan v. Partida*, 492 F.2d 707, 709 (5th

20-14044              JORDAN, J., Concurring                    9

Cir. 1974) ("An unbroken line of authority makes it abundantly clear that a determination of whether a worker is an 'employee' within the [FLSA] depends on the underlying economic realities.") (collecting cases).

Admittedly, my approach is not completely at odds with *Schumann*, 803 F.3d at 1212, and *Glatt*, 811 F.3d at 5337, both of which take into account all of the relevant circumstances. Nevertheless, I think it offers some comparative benefits. Practically, it does not pigeonhole Ms. McKay into an extern/intern category where she does not belong. *Cf. Schumann*, 803 F.3d at 1212 (noting that "the training in *Portland Terminal* was so different from a modern internship for academic, certification, and licensure purposes"); Matthew Tripp, *In the Defense of Unpaid Internships: Proposing a Workable Test for Eliminating Illegal Internships*, 63 Drake L. Rev. 341, 353–54 (2015) ("*Portland Terminal* was a case about trainees, not interns. . . . All in all, applying the trainee test to interns is like forcing a square peg into a round hole."). Linguistically, it is more straightforward because it avoids listing a large number of preset factors while at the same time characterizing them as non-exclusive. *See Nat. Trust Ins. Co. v. Southern Heating and Cooling, Inc.*, 12 F.4th 1278, 1286 (11th Cir. 2021) (explaining that because our list of guideposts for the exercise of discretion under the Declaratory Judgment Act is not exhaustive, not all are required, and none are controlling, "we essentially employ a totality-of-the-circumstances standard"); *In re Jefferson Cnty., Ala.*, 491 B.R. 277, 297 n.15 (N.D. Ala. 2013) (observing that multi-factor

10                    JORDAN, J., Concurring                    20-14044

tests "essentially come down to a totality of the circumstances analysis").

The lower federal courts have applied *Portland Terminal* in a number of cases addressing whether run-of-the-mill trainees (i.e., persons doing work (i) without receiving academic credit and (ii) not for professional licensure and certification) are employees under the FLSA. Those cases, it seems to me, are the most analogous to Ms. McKay's participation in the FIPP.[5]

---

[5] In addition to *Schumann* and *Glatt*, there are numerous circuit and district court cases addressing whether students or other persons doing work connected in some way to their academic endeavors or to licensure/certification were employees under the FLSA. I list some of those cases here, but do not discuss them because Ms. McKay's work at the FIPP did not have an educational component or connection and was not done for the purpose of licensure or certification. *See, e.g., Velarde v. GW GJ, Inc.*, 914 F.3d 779, 785–89 (2d Cir. 2019); *Nesbitt v. FCNH, Inc.*, 908 F.3d 643, 645–49 (10th Cir. 2018); *Benjamin v. B & H Educ., Inc.*, 877 F.3d 1139, 1147–48 (9th Cir. 2017); *Wang v. Hearst Corp.*, 877 F.3d 69, 71, 73–76 (2d Cir. 2017); *Hollins v. Regency Corp.*, 867 F.3d 830, 836 (7th Cir. 2017); *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 520 (6th Cir. 2011); *Bienkowski v. Northeastern Univ.*, 285 F.3d 138, 139–41 (1st Cir. 2002); *Marshall v. Regis Educ. Corp.*, 666 F.2d 1324, 1327 (10th Cir. 1981); *Marshall v. Baptist Hosp., Inc.*, 473 F. Supp. 465, 472–75 (M.D. Tenn. 1979), *rev'd on other grounds*, 668 F.2d 234 (6th Cir. 1981). There are also some cases addressing whether persons doing work in church- or religious-related activities are employees under the FLSA. I do not discuss them either because they have an element not present here. *See, e.g., Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761, 767 (6th Cir. 2018); *Reich v. Shiloh True Light Church of Christ*, 85 F.3d 616, 1996 WL 228802, at *1–*3 (4th Cir. 1996).

Cases in which courts have held that trainees were FLSA employees under *Portland Terminal* include *Wirtz v. Wardlaw*, 339 F.2d 785, 786–87 (4th Cir. 1964) (high school students working 43 hours each week during the summer at an insurance agency for wages of $12 per week, a sum below minimum wage standards), and *McLaughlin v. Ensley*, 877 F.2d 1207, 1210 (4th Cir. 1989) (snack food distribution trainees who accompanied and assisted experienced routemen during a week-long orientation period). Cases in which courts have held that trainees were not FLSA employees include *Donovan v. American Airlines, Inc.*, 686 F.2d 267, 268–73 (5th Cir. 1982) (flight attendant/reservation sales agent trainees attending training at airline's facility for 40 hours per week for two to five weeks); *Donovan v. Trans World Airlines, Inc.*, 726 F.2d 415, 416–17 (8th Cir. 1984) (flight attendant trainees attending training at airline's facility for four weeks); and *Reich v. Parker Fire Protection Dist.*, 992 F.2d 1023, 1025–29 (10th Cir. 1993) (firefighters who had to attend and complete a 10-week training course at the firefighting academy as a condition of employment). *See also Jacksonville Terminal*, 148 F.2d at 769–71 (pre-*Portland Terminal* case involving trainees of a terminal company who worked alongside full crews for a training period averaging one week). These decisions are of course context- and fact-dependent, but they shed some light on what matters in a case like this one, and I'll return to them later in Part III.

**B**

In this circuit, whether or not a person is an employee under the FLSA generally constitutes a question of law. *See, e.g., Schumann*, 803 F.3d at 1207. But that does not mean that fact-finding by a jury is never warranted or permitted. A legal standard can only be applied to a set of facts, and when the facts (and/or inferences) are disputed Rule 56 kicks in.

Not surprisingly, we have explained that juries can decide contested factual matters in FLSA disputes. *See, e.g., Watkins v. City of Montgomery, Ala.*, 775 F.3d 1280, 1288 (11th Cir. 2014) ("We acknowledge that the question of whether pay deductions for exempt employees are permissible under the FLSA can present a question of law that falls outside of the providence of the jury. But that is not necessarily the case, and it was not the situation here."). And we have several cases holding that FLSA issues must be put to the jury when there is conflicting evidence. *See, e.g., Mitchell v. City Ice Co.*, 273 F.2d 560, 562 (5th Cir. 1960) (whether company's sales were "retail sales" for purposes of an FLSA exemption); *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1141 (11th Cir. 2018) (whether valet tickets used by company in its commercial parking service were "materials" within the meaning of the FLSA's "handling clause"); *St. Elien v. All Cnty. Env't Serv., Inc.*, 991 F.3d 1197, 1199–1201 (11th Cir. 2021) (whether employee was engaged in interstate commerce for purposes of the FLSA). One such case requiring a jury trial due to material issues of fact concerned a question similar to the one presented here—whether a trainee learning the job of an automobile wholesaler was an

20-14044                    JORDAN, J., Concurring                    13

employee under the FLSA.  *See Axel v. Fields Motorcars of Florida, Inc.*, 711 F. App'x 942, 947–49 (11th Cir. 2017).[6]

Rule 56 does not just forbid summary judgment when the material facts are disputed; it also requires a jury trial when the facts are undisputed but the inferences that can be drawn from those facts are contested.  "Even where the parties agree on the facts, '[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment.'"  *Manners v. Cannella*, 891 F.3d 959, 967 (11th Cir. 2018) (citation omitted).  *Accord Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296–97 (11th Cir. 1983); *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213–14 (5th Cir. 1969); Mary Kay Kane, 10A Fed. Prac. & Proc. Civ. (Wright & Miller) § 2725.2 (4th ed. & April 2022 update).  With these principles in mind, I turn to the evidence submitted by the parties at summary judgment.

### III

The court's summary judgment analysis is flawed.  I try to explain why below.

---

[6] The majority says that we applied the *Schumann* test to a trainee who was not enrolled in any formal education program in *Axel*.  Fair enough, but the majority fails to grapple with the reality that *Axel* concluded that a genuine issue of material fact existed as to whether the plaintiff was an employee given the length of his time as a "trainee" and his possible displacement of other employees' work.  *See* 711 F. App'x at 947–48.

## A

According to the court, certain facts point to Ms. McKay not being an employee of Miami-Dade County while working in the FIPP. First, she understood that there was no promise or expectation of compensation for participation in the FIPP. Second, she chose to participate in the FIPP to obtain valuable training similar to what she would have received in a formal forensic degree program and to avoid another four years of school. Third, the six-month duration of the FIPP was not "grossly excessive."

I agree that Ms. McKay's desire to obtain valuable training in lieu of further studies weighs in favor of non-employee status. But the other matters cited by the court are not clear-cut and do not entitle Miami-Dade County to summary judgment.

For starters, although *Portland Terminal* considered the worker's express or implied expectation of compensation, *see* 330 U.S. at 151–52, the parties' subjective understanding and intent matters little under the FLSA. *See, e.g., Partida*, 492 F.2d at 709 ("Nor does it matter that the parties had no intention of creating an employment relationship, for application of the FLSA does not turn on subjective intent."). Indeed, the Supreme Court has held that the FLSA can apply even when workers deny that they are covered employees. *See Alamo Foundation*, 471 U.S. at 302 ("If an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to

20-14044          Jordan, J., Concurring              15

make such assertions, or to waive their protections under the Act.").

As for the six-month term of the FIPP, the court brushes it off way too easily at summary judgment. The length of the training matters under the FLSA, and we must remember that the training in *Portland Terminal* lasted only seven to eight days. It is telling that none of the post-*Portland Terminal* decisions holding that trainees (i.e., not externs or interns doing work for academic credit, licensure, or certification) were not employees have involved a training course of over 10 weeks. *See American Airlines, Inc.*, 686 F.2d at 268–73 (two- to five-week training course for flight attendant and reservation sales agent trainees); *Trans World Airlines,* 726 F.2d at 416–17 (four-week training course for flight attendant trainees); *Parker Fire Protection Dist.*, 992 F.2d at 1025–29 (10-week training course for career firefighters seeking employment). The FIPP was more than double that maximum length of time, and Ms. McKay participated in it for five months. The only programs that rival that length of time and were not deemed employment relationships under the FLSA were all part of broader rehabilitation initiatives. See, e.g., *Williams v. Strickland*, 87 F.3d 1064, 1066–68 (9th Cir. 1996) (participant in six-month rehabilitation program was not an "employee" entitled to wages under the FLSA for work therapy component of program); *Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.*, 856 F. App'x 445, 450–56 (4th Cir. 2021) (participant in 24-month residential program for homeless veterans, which required on- or off-site volunteer work as part of

job training, was not an "employee" under the FLSA for either his service or job training hours).  Furthermore, as explained later, the FIPP "interns" were ready to work as independent autopsy photographers after the first four weeks of training.  A jury could find that the FIPP exceeded what was needed to provide training to participants like Ms. McKay and at some point turned into an employment relationship.

B

The court does not cite or discuss other evidence in the summary judgment record which, viewed in favor of Ms. McKay, supports her position.  This evidence—on its own or together with reasonable inferences—creates an issue of material fact as to whether Ms. McKay was an employee.  To put the evidence in its proper context, I first provide some background facts about the FIPP.

The FIPP is a well-known six-month program run by the Forensic Imaging Bureau of the Miami-Dade County Medical Examiner's Office.  It has existed for over 20 years, and seems to be the only program of its kind in the country.  "Interns" in the FIPP receive training in forensic and studio photography and have and exposure to networking opportunities that will hopefully assist them in obtaining jobs in the field.  The Bureau typically has four FIPP "interns" a year, but that varies—sometimes there are more and sometimes there are less—and they typically work from 6:30 a.m. to 3:00 p.m. or 7:30 a.m. to 4:00 p.m. each day.  The Bureau tries to limit the number of interns to two at a time (i.e., two for each

20-14044                JORDAN, J., Concurring                17

six-month cycle).  Any forensic photographers hired by the Bureau must have completed the FIPP. *See* D.E. 33 at ¶¶ 2–3; D.E. 38 at ¶ 4; Wolf Dep., D.E. 26-4, at 12, 17, 123; McKay Dep., D.E. 26-1, at 21.[7]

On average, the Medical Examiner's Office handles about eight autopsies a day.  The Bureau has four employees who are forensic photographers. Leonard Wolf, the forensic photographer supervisor, oversees the FIPP; Heidi Nichols, Belmarie Lyons, and Dominique Tomillo serve as forensic staff photographers.  During 2019, when Ms. McKay participated in the FIPP, each of the four Bureau photographers served as the primary autopsy photographer (the photographer who had the primary responsibility for taking photographs on a given day) on one day of the week and as the backup autopsy photographer on a different day of the week.  The four photographers were designated as the primary and backup autopsy photographers in rotation on weekends and the following Mondays.  *See* D.E. 30 at ¶¶ 9, 10–13; D.E. 33 at ¶¶ 19–21; Wolf Dep., D.E. 26-4, at 52.

Viewing the summary judgment record in her favor, the following evidence precludes summary judgment on whether Ms. McKay was an employee of Miami-Dade County during some portion of the FIPP.

---

[7] Several years ago, the Bureau hired temporary photographers "to give them an additional year's work of experience, paid working experience so that they could get a job in the field." Wolf Dep., D.E. 26-4, at 16.

18                    JORDAN, J., Concurring                    20-14044

♦ The primary training, supervision, and feedback provided to Ms. McKay during the FIPP lasted only four weeks. During the first two weeks, she completed a binder of workbook assignments, which were evaluated, and during the third and fourth weeks she was trained to take autopsy photographs at the morgue. She initially shadowed a staff photographer and took autopsy photographs behind that photographer. She then took the photographs under the staff photographer's direction and supervision. But she only received written comments on her work on six days and only received verbal comments occasionally; she was not graded on her work and did not receive any written evaluation of her work because evaluations are only prepared if the "intern" is participating in the FIPP through Barry University. After the first four weeks of training, Ms. McKay was ready to be a primary autopsy photographer, and staff photographers rarely took autopsy photographs. The staff photographers took the photographs in autopsies involving police-involved shootings, as the FIPP "interns" were not allowed to do so. *See* D.E. 30 at ¶¶ 15–17, 23–24, 32–35; D.E. 33 at ¶ 13; Wolf Dep., D.E. 26-4, at 60–61, 82–83, 125–30.

♦ For the fifth through eighth weeks, Ms. McKay and Jessica Narvaez—the other "intern" in the FIPP—worked independently in the morgue as the primary autopsy photographers. During this time they received no significant new training, instruction, coaching, or advice to improve their performance. And the staff photographers were not in the morgue to supervise their work; they were usually in their offices across the hall, though they sometimes

20-14044                JORDAN, J., Concurring                19

stopped by the morgue to ask if an "intern" needed any help. Ms. McKay photographed all the autopsies performed by one doctor, and Ms. Narvaez photographed all the autopsies performed by the other doctor. The two alternated weekends, so that Ms. McKay and Ms. Narvaez each worked two weekends during this period. *See* D.E. 30 at ¶¶ 18–19, 25–27.[8]

♦ Mr. Wolf allowed the FIPP "interns" to work alone on weekends because they had acquired the proper skill set to be the primary autopsy photographer. On weekends when an "intern" was the primary autopsy photographer, a staff photographer came in only if there was an autopsy for a police-involved shooting. In all the weeks that Ms. McKay was the primary autopsy photographer, a staff photographer was present in the morgue just one day. *See* D.E. 30 at ¶¶ 28–29.[9]

♦ After the eighth week Ms. McKay and Ms. Narvaez worked alternating weeks (including weekends) in the morgue as

---

[8] Miami-Dade County asserts that that one of Ms. McKay's predecessors in the FIPP reviewed autopsy photographs with the staff photographers "daily or, if not daily, every other day" after the initial weeks. D.E. 33 at 11, 14. That assertion, as noted in the text, is disputed. *See also* D.E. 35 at ¶ 14 (explaining the evidentiary basis for the dispute).

[9] According to Miami-Dade County, the FIPP "interns" cannot learn everything in two to three weeks, and repetition over the course of six months "locks the skills in." D.E. 33 at ¶ 24. That assertion, as set out in the text, is also disputed. *See* D.E. 35 at ¶ 24 (explaining the evidentiary basis for the dispute).

the primary autopsy photographer. When they were not the primary photographer, they worked in the FIPP office and served as the backup photographer. Their backup stints were referred to as "assignment weeks," and on the Monday of these weeks they were given instructions on topics related to forensic photography. But they were not graded or evaluated on the photos they took for assignments. During the rest of an "assignment week," they received no instruction and were able to do whatever other Bureau-related tasks they wanted as long as they were available as backup. *See* D.E. 30 at ¶¶ 20–22, 36–37.[10]

♦ Staff photographers usually work eight-hour days and are paid an hourly wage. If they work more than 40 hours in a workweek, they are paid overtime. After her first four weeks in the FIPP, Ms. McKay worked 508.75 hours (including 50.75 hours of overtime) as a primary autopsy photographer over 10 weeks and nine weekends. She was not compensated for that work. When an FIPP "intern" works as the primary autopsy photographer on weekends, she is doing the same work as a staff photographer. As a result, the Bureau saves money because it does not need to pay a staff photographer to work overtime. To put this in dollar terms, the Bureau's budget allows for 16 hours of overtime each weekend, and when two FIPP "interns" are available there is less need for any

---

[10] Training in crime scene photography is supposed to take place during the sixth and final month of the FIPP, but Ms. McKay only participated for five months. *See* Wolf Dep., D.E. 26-4, at 98–99.

20-14044              JORDAN, J., Concurring              21

overtime expenditures (staff photographers work weekends one out of six weeks when there are two FIPP "interns" as opposed to one out of every four weeks when there are none). And when an "intern" works as the primary autopsy photographer during the week, staff photographers are free to do other work. As Ms. Lyons explained, staff photographers would "absolutely" need to work more hours than they currently do if "interns" were not taking autopsy photographs. *See* D.E. 30 at ¶¶ 41–47, 50–51; Wolf Dep., D.E. 26-4, at 18, 22, 29.[11]

♦ Darren Caprara, Miami-Dade County's Director of Operations, testified that FIPP "interns" are treated "much like temporary employees, much like part-time employees." D.E. 30 at ¶ 48. Mr. Caprara explained that the County benefits when the "interns" take autopsy photographs because that frees the staff photographers to do other tasks. *See id.* at ¶ 49. Mr. Wolf agreed that the

---

[11] Miami-Dade County asserts that there is constant evaluation of the FIPP "interns," that its staff photographers—Ms. Lyons, Ms. Tomillo, and Ms. Nichols—spent a lot of time during their workweek supervising the "interns," and that it takes a lot more time to provide the training than would be required if staff photographers did the work themselves. *See* D.E. 33 at ¶ 25 (having interns causes Ms. Lyons "to have more work, because it requires constant teaching"), ¶ 26 (Ms. Tomillo spends "more than half her workweek working with interns" when there are two of them), ¶ 27 (Ms. Nichols spends "a lot of her time helping the interns rather than doing her own job"); Wolf Dep., D.E. 26-4, at 126 ("So, this evaluation really happens all the time."), 134 ("[I]t's a lot more work to teach the students than it is to do it ourselves."). Those assertions, given Ms. McKay's contrary evidence, is disputed. *See* D.E. 35 at ¶¶ 25–27 (explaining the evidentiary bases for the disputes).

"valuable professional experience that [FIPP "interns"] receive consists of providing the same photographic services for the six months that employee photographers would otherwise perform," albeit without compensation.  Wolf Dep., D.E. 26-4, at 133.  And he acknowledged that the County saved money when FIPP "interns" were working as the primary autopsy photographers.  *See id.* at 134.

## C

As discussed earlier in Part II.A, there was no educational component or connection to Ms. McKay's participation in the FIPP. Nor was Ms. McKay seeking to complete to the FIPP—which was a long six months—to obtain licensure or certification.  Assuming that the first four weeks of the FIPP were not covered by the FLSA under *Portland Terminal* because they involved necessary and appropriate instruction, training, and evaluation, a jury should decide whether Ms. McKay was an employee during the last four months of her participation in the FIPP.  Even in the extern/intern context involving academic credit, licensure, and certification, a non-FLSA training regimen can turn into an employment relationship:

> [T]he proper resolution of a case may not necessarily
> be an all-or-nothing determination.  That is, we can
> envision a scenario where a portion of the student's
> efforts constitute a *bona fide* internship that primarily
> benefits the student, but the employer also takes un-
> fair advantage of the student's need to complete the

> internship by making continuation of the internship .
> . . contingent on the student's . . . working of hours
> well beyond the bounds of what could fairly be ex-
> pected to be a part of the internship.

*Schumann*, 803 F.3d at 1214–15.  A jury could find that this is what happened with Ms. McKay after the first four weeks of the FIPP.[12]

First, there was no real training, supervision, or substantive feedback in the FIPP after the first four weeks.  Given that the "interns" were proficient at forensic photography after four weeks (or at the latest eight weeks), they continued to work as autopsy photographers well after the value of their training had subsided.  That makes an FIPP "intern" look more like an employee during the last four to five months of the program.  *See Portland Terminal*, 330 U.S. at 152–53 (comparing the railroad trainees to students taking similar courses of instruction at a vocational school). *Cf. Marshall*, 473 F. Supp. at 474–76 (finding that x-ray vocational students working in a hospital practicum were employees in part because the

---

[12] Based on my view of the applicable law and the evidence in the record, I do not opine on whether the Sixth Circuit correctly ruled that "when a plaintiff asserts an entitlement to compensation [under the FLSA] only on a portion of the work performed in the course of an educational relationship, courts should apply the primary-beneficiary test . . . only to that portion of the relationship, not to the broader relationship as a whole." *Eberline*, 982 F.3d at 1014 (2-1 decision).  Even if the first four weeks are factored into the analysis, the last four months constituted 80% of Ms. McKay's time in the FIPP.

"training . . . was deficient" and the students were "shortchanged educationally").[13]

Second, after the first four weeks, the FIPP "interns" were largely working on their own, without supervision, as primary and backup autopsy photographers. That is contrary to one of the important facts in *Portland Terminal*, 330 U.S. at 150, where the trainees were working under the constant supervision of experienced employees. *Cf. McLaughlin*, 877 F.2d at 1210 ("The prospective employees [in the orientation program] were simply helping to service a route, and the instruction they received did not rise to the level that one would receive in a general, vocational course in 'outside salesmanship.' The trainees were taught only specific job functions related to [the employer's] own business."); *Marshall*, 473 F. Supp. at 473 ("[W]ithin a relatively short period of time the trainees became functioning members of the X-ray department, performing all duties required of them in a fashion that displaced regular employees and under such conditions in which the hospital obtained a substantial economic benefit from their services.").

---

[13] As noted in the initial citation to *Marshall* in footnote 4, the Sixth Circuit reversed the district court's judgment in that case but did so on the separate ground of good faith based on an administrative regulation. *See Marshall*, 668 F.2d at 237–39. But before addressing good faith, the Sixth Circuit "agree[d] that the record support[ed] the general findings of the [district court] that the clinical training program was seriously deficient in supervision, and that the students continued to perform clerical chores long after the educational value of that work was over." *Id.* at 236. The district court's decision in *Marshall* therefore remains persuasive authority.

20-14044                JORDAN, J., Concurring                25

Third, the autopsy photography work independently performed by the FIPP "interns" greatly benefitted Miami-Dade County in two ways: (1) it allowed the Bureau's staff photographers to do other work that they would otherwise need more hours to complete, thereby eliminating (or reducing) the need to hire more employees; and (2) it permitted the County to avoid paying the staff photographers overtime for working on weekends. That reality is also at odds with *Portland Terminal* because the work of the trainees there did not expedite the railroad's business and sometimes impeded it and retarded it. *See* 330 U.S. at 150. To borrow from the language in *Wirtz*, 339 F.2d at 788, here the County, "no less than [the FIPP "interns"], benefited from their labors. Their activities served [the County's] interests, and indeed were an essential part of its . . . activities[.]" *See also Schumann*, 803 F.3d at 1213 ("If the railroad [in *Portland Terminal*] had also obtained a direct and immediate financial or competitive advantage from providing a training program that it was going to have to offer for its own business reasons regardless of whether it received a direct advantage, that could have served as an indication that the railroad Was taking unfair advantage of the situation.").[14]

---

[14] That the FIPP is a unique program in the country cuts both ways on the question of employee status. On one hand, a jury could infer that because there are no comparators it is difficult to say that the FIPP extends beyond what is needed for real-world training. On the other, a jury could also infer that Miami-Dade County takes advantage of the "interns" because they have nowhere else to go for this type of experience.

Fourth, because the Bureau operates the FIPP on a year-round basis (usually with two "interns" for each six-month cycle), it was essentially getting the work of another independent staff photographer for free. Let me explain. If Ms. McKay's 500 or so hours for a four-month period are a fair barometer, each FIPP "intern" would work about 38 hours a week (500 hours ÷ 13 weeks). Given that two "interns" are usually in the FIPP at the same time, that equates to the County getting about 3,800 hours of free forensic photography work a year (38 hours a week x 2 "interns" x 50 weeks). Even if one assumes that the "interns" are not doing any compensable work during the first month of the FIPP, that is still a combined 3,396 hours a year (3,900 – 304 hours [152 hours per "intern"]). The Bureau has just four paid photographers, so the County derived a "substantial economic benefit from the[ ] services" of the FIPP "interns." *See Marshall*, 473 F. Supp. at 473. If a jury were to award Ms. McKay backpay at Florida's 2019 minimum wage for the 508.75 hours (including 50.75 hours of overtime) that she worked from her fifth week on as a FIPP "intern," that alone would total $4,518.70. *See* D.E. 31 at 17 & n.2. And the overall savings have been significant, as the FIPP has been in existence for over 20 years. That is probably why Mr. Wolf and his colleagues at Miami-Dade County are "always talk[ing]" about whether FIPP "interns" should be paid. Wolf Dep., D.E. 26-4, at 171.

The economic realities of the situation, *see Alamo Foundation*, 471 U.S. at 301, permit a jury to find that after the first month of the FIPP the County is freeloading on unpaid labor to its

financial benefit, including the non-payment of overtime. And that makes this case different than those in which trainees have not been deemed FLSA employees under *Portland Terminal*. *See Trans World Airlines*, 726 F.2d at 416–17 (agreeing with the district court that "flight attendant trainees were not 'employees' within the meaning of . . . the FLSA because [the airline] received no immediate benefit from their efforts during training"); *American Airlines*, 686 F.2d at 272 (agreeing with the district court's findings that the "trainees gain the greater benefit from their experience" and that the airline "did not receive immediate benefit from the trainees' activities" because the "trainees are not productive for [the airline] until after their training ends"). *Cf. Kaplan v. Code Blue Billing & Coding, Inc.*, 504 F. App'x 831, 834 (11th Cir. 2013) (case involving student externs: "Even viewing the evidence in the light most favorable to Plaintiffs, [they] caused Defendants' businesses to run less efficiently and caused at least some duplication of effort. Defendants received little if any economic benefit from Plaintiffs' work. Thus, under the 'economic realities' test, Plaintiffs were not 'employees' within the meaning of the FLSA.").

## IV

I would reverse and remand for a jury trial on whether Ms. McKay was an employee of Miami-Dade County under the FLSA during the last four months of her participation in the FIPP.